UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AARON BETTS,                              )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )          No.   4:14CV225 TIA
                                          )
CAROLYN W. COLVIN, Commissioner           )
of Social Security,                       )
                                          )
                    Defendant.            )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act.  Claimant has filed a

Brief in Support of his Complaint; the Commissioner has filed a Brief in Support of her Answer.

The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

I.      **Procedural History**

On January 27, 2011, Claimant Aaron Betts filed Applications for Disability Insurance

Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 107-13)[1] and for  Supplemental

Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381,

et. seq. (Tr. 114-19).  Claimant states that his disability began on February 15, 2009, as a result of

aortic heart dissection.  (Tr. 55).  On initial consideration, the Social Security Administration

denied Claimant's claims for benefits.  (Tr. 56-60).  Claimant requested a hearing before an

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 13/filed April 14, 2014).

Administrative Law Judge ("ALJ"). (Tr. 63-67). On June 28, 2012, a hearing was held before the ALJ who issued an unfavorable decision on November 14, 2012. (Tr. 9-19, 23-46). The Appeals Council on December 5, 2013 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision after considering the brief of representative. (Tr. 1-5, 195-96). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on June 28, 2012

At the hearing on June 28, 2012, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 23-46). At the time of the hearing, Claimant was thirty-four years of age, and his date of birth is September 11, 1977. (Tr. 26). Claimant testified that he completed high school. Claimant stands at six feet and weighs 200 pounds. (Tr. 26). He is right-handed. (Tr. 27). He lives with his mother who works outside the home. (Tr. 39).

Claimant testified that he last worked in October 2009 at US Lockbox after almost two years, and his duties included shipping and receiving and data entry. (Tr. 27). Before that job, he worked at Neece and Art Craft in customer service. (Tr. 27). For twelve years, Claimant worked at FedEx as a quality assurance manager, and his duties included customer service, loading trucks, and making deliveries. (Tr. 28). FedEx terminated him for stealing time off the clock and showing favoritism towards employees. (Tr. 28).

Claimant has congestive heart failure and dissection of the aorta. (Tr. 29). He testified that his doctors told him he was working too much lifting weights seven days a week and not getting any rest causing his aorta to dissect. (Tr. 29-30). He sought medical treatment after

- 2 -

hurting his ankle and having a bad cough for two to three weeks. (Tr. 30). The doctor at Grace

Hill gave him some antibiotics as treatment but the medication did not work, and his cough

worsened. (Tr. 30). He sought treatment at Barnes Jewish Hospital, and the doctor performed

the aortic dissection and repaired his aneurysm in his head. (Tr. 30-31). Claimant testified that he

has some congenital problem with his blood vessels. (Tr. 31). He has not been hospitalized since

December 2010. (Tr. 32). Dr. Susan Joseph and Dr. Braverman, cardiologists, treat Claimant.

(Tr. 32). He testified that he is treated with medications. (Tr. 33). Claimant has not had any

other treatment for the aneurysm other than the treatment he received while hospitalized at

Barnes. (Tr. 34).

Claimant testified that his condition prevents him from standing on his feet and sit down

for a long period of time. (Tr. 35). He cannot walk long distances without taking a break, and

he uses a cane to assist with walking and maintaining his balance. (Tr. 36, 42). After walking for

fifteen minutes, he is exhausted, and he starts gasping for breath. (Tr. 36). The cane helps his

balance because he experiences dizzy spells. Because of his dizziness spells, Claimant cannot

stand for a long period of time. (Tr. 37). He is uncomfortable sitting because his body becomes

numb. Lying down puts him in a comfortable position. (Tr. 37).

Claimant testified that he has problems with his back and knees, and he needs to elevate

his legs. (Tr. 38). He follows the doctors' orders by keeping his feet elevated and lying down on

a bed. Claimant testified that he spends more than half of the day lying down only getting up to

use the restroom. (Tr. 38). He has been told not to lift anything heavy. (Tr. 39). His surgeon

told him if he lifts any heavy item, the repair to his aorta could rupture. (Tr. 39). Five to six

times a day he experiences episodes of chest pressure lasting from one to two hours. (Tr. 42).

Lying down makes him feel better.   (Tr. 43).

Since the surgery, Claimant feels his symptoms are becoming worse.  (Tr. 43).  His

surgery has not helped with his breathing and walking.  (Tr. 43).  He takes naps at least twice a

day for three to four hours.  (Tr. 44).  The last time he had the treadmill test was when he had the

surgery.  (Tr. 44).  Claimant testified to prevent another aneurysm or overload his heart, he

cannot be in extremely hot or cold weather; he cannot lift anything heavy; and he has to avoid

anything stressful.  (Tr. 45).

## 2.  Forms Completed by Claimant

In the Disability Report - Adult, Claimant reported he stopped working on February 15,

2009 "[b]ecause of my condition(s) and other reasons" noting that the department in which he

worked closed down."  (Tr. 173-79).

In the Function Report - Adult completed on March 25, 2011, Claimant

reported his daily activities include reading books, watching television, making his bed, doing the

laundry, polishing and wiping down things as needed.  (Tr. 150, 152).  He listed playing pool,

throwing darts, bowling, and playing any video games as his hobbies.  (Tr. 154).  Claimant spends

time with others playing cards.  (Tr. 154).  He goes to the doctor's office three to four times a

month.  (Tr. 154).  The use of a cane for long periods of standing and walking was prescribed

when he was discharged from the hospital.  (Tr. 156).

## III.   Medical Records and Other Records

To obtain disability insurance benefits, Claimant must establish that he was disabled within

the meaning of the Social Security Act not later than the date his insured status expired -

December 31, 2014.  Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status."); see also 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.

On December 14, 2010, Claimant presented in the emergency room seeking treatment for cough of two months after being diagnosed with pneumonia at Urgent Care one week earlier. (Tr. 244, 256). He was given a Z-Pak as treatment, and he experienced some relief but his symptoms returned after he finished the antibiotic. (Tr. 256). He reported having shortness of breath and chest pain, and his heart beating faster. (Tr. 245, 257). Examination showed his heart rate greater than 110. (Tr. 245). He reported productive cough, body aches and tachypnea with exertion since May. (Tr. 246). Claimant reported being an unemployed warehouse office staff. (Tr. 257). In the progress note, a doctor noted how cardiac surgery was aware of large aortic dissection. (Tr. 261). Dr. Heiken noted in the Impression, patchy consolidation in the right lower lung, most consistent with pneumonia and mild to moderate cardiomegaly. (Tr. 274). Dr. Douglas Char made the diagnosis of acute dissection - thoracic. (Tr. 293). It is noted how no primary care physician would be contacted because he had no primary care doctor of record. (Tr. 294).

On December 15, 2010, Dr. Marc Moon performed aortic root replacement surgery and replaced the emergent ascending aortic with a Hemashield graft and placed a intra-aortic balloon pump. (Tr. 238). Claimant presented in the emergency room the night before, and he was taken to the operating room for emergent repair, and Dr. Moon then found he had very severe aortic regurgitation, dilated left ventricle, and elevated BNP. Dr. Moon did an aorta to innominate bypass due to near-occlusion of his innominate artery and noted the procedure gave excellent flow into his right carotid and subclavian. (Tr. 238). Dr. Moon noted Claimant to have a chronic

dissection of unknown duration.  (Tr. 239).

The December 15, 2010 Chest Computed Tomography showed a large ascending aortic aneurysm and a Type A aortic dissection originating at the aortic root and extends through the ascending aorta and aortic arch up to the level of the left subclavian artery.  (Tr. 22-30).

The Transthoracic Echocardiography with Color Doppler revealed status post aortic root repair after aortic dissection, paradoxical septal motion, and overall LV systolic function severely decreased.  (Tr. 223-24).

In the December 27, 2010 Discharge Note, Dr. Moon noted his principal diagnosis to be aortic dissection repair and directed Claimant to schedule an appointment with his cardiologist in four weeks.  (Tr. 225).  In the Activity Guidelines for Cardiac Surgery, Claimant was limited pushing, pulling, or lifting anything heavier than ten pounds for four to six weeks.  (Tr. 226).

The January 13, 2011 x-ray showed the bibasilar opacity seen on the prior study of December 25, 2010 have improved with minimal residual atelectasis remaining, no pleural effusion, and mild cardiomegaly unchanged.  (Tr. 220, 305).

On February 16, 2011, Dr. Susan Joseph treated Claimant's congestive heart failure and aortic regurgitation.  (Tr. 349).  Claimant reported that he is awaiting his Medicaid insurance to be approved before going to cardiac rehab, but he has been trying to do simple things like walking around the house and in the neighborhood in order to rehab.  He reported some residual right groin discomfort that has required him to use a cane.   At his evaluation, Dr. Moon found that this would probably get better in the next one to two months.  Prior to his admission in December 2010, Claimant was exercising six times a week, mostly weightlifting and light jogging.  (Tr. 349).  Dr. Joseph prescribed a medication regimen as treatment.  In response to his query regarding any

limitations of exercise, Dr. Joseph told him he should not do any isometric exercise, but he should continue to do cardiovascular workouts as he has been with walking and progressively increasing the amount of time that he walks for as he can tolerate. (Tr. 350)

In follow-up treatment on March 9, 2011, Claimant reported doing well with no symptoms of shortness of breath, dizziness, or swelling. (Tr. 345). Examination showed no edema. (Tr. 345). Dr. Joseph continued his medication regimen as treatment. (Tr. 346).

On April 6, 2011, Dr. Alan Braverman completed a consultation regarding aortic dissection on referral by Dr. Joseph. (Tr. 341). Dr. Braverman noted how Claimant was found to have a chronic type-A dissection and markedly dilated aortic root, and severe aortic regurgitation as well as congestive heart failure in December 2010. (Tr. 341). He reported a history of intense weight training lifting up to 300 to 350 pounds by bench press over the last two years. (Tr. 342). Claimant denied any orthopnea, syncope, and palpitations and basically feeling generally well. Examination showed no peripheral edema present. (Tr. 342). Dr. Braverman found Claimant to be doing remarkably well, and his recovery to be quite incredible. (Tr. 343). Dr. Braverman noted Claimant does not have any signs or symptoms of heart failure. With regard to the etiology to the aortic dissection, Dr. Braverman opined that he may have some underlying genetic trigger and recommended against any weight lifting but he could lift ten pounds at a time with repetitions. Dr. Braverman noted that Claimant is on a good medical regimen for heart failure which is also controlling his blood pressure adequately. (Tr. 343).

On May 18, 2011, Claimant reported doing much better since his last visit with improved exertional capacity. (Tr. 338). He occasionally experiences chest pain lasting for fifteen to twenty seconds after rest or long periods of exertion. Dr. Joseph noted how he did not have any

shortness of breath, edema, dizziness, or significant lower extremity edema. (Tr. 338). Dr. Joseph opined that the likely etiology of his aortic dissection was intense weightlifting, and his family history has some congestive heart failure but no significant aortic problems. (Tr. 339). Claimant noted how he is looking for a primary care physician. Examination showed no edema. His last chest CT from April 21 showed an ascending aortic graft replacement with previous type A dissection and a persistent root aneurysm. Dr. Joseph listed congestive heart failure in her impression and noted Claimant to be doing well from a heart failure standpoint and prescribed medications as treatment. Dr. Joseph treated his aortic disease by continuing to control his blood pressure aggressively and placing a limitation of lifting no more than ten pounds at most and recommended cardiac rehab to determine what exercise capacity he can tolerate. (Tr. 339).

At the request of counsel, Dr. Joseph completed a Cardiac Residual Functional Capacity Questionnaire on June 28, 2011. (Tr. 306). Counsel noted that he was not asking Dr. Joseph to evaluate Claimant, but he wanted her to "use the information you already have in your file to complete the attached form so that the judge may better understand the diagnosis, prognoses and physical and mental limitations." (Tr. 306). Dr. Joseph listed one date, February 16, 2011, as the nature, frequency and length of contact. (Tr. 308). In response to the diagnosis with New York Heart Association functional classification, Dr. Joseph listed Class II. As to clinical findings, Dr. Joseph noted "congestive heart failure with an EF of 15-20% with history of chronic aortic dissection with an aortic root replacement in Dec. 2010." (Tr. 308). Dr. Joseph noted his anginal pain to last fifteen to twenty seconds intermittent with rest at times and with activity at times. (Tr. 309). She found he was incapable of performing low stress jobs because he has congestive heart failure. (Tr. 309). She found Claimant should avoid concentrated exposure to wetness and

noise and avoid all exposure to extreme heat and cold, humidity, fumes, and hazards. (Tr. 311).

Dr. Joseph noted he would on average miss more than four days of work each month. (Tr. 312).

Dr. Joseph found Claimant could sit one to two hours before needing to get up and stand one

hour before needing to sit down. (Tr. 313). He would need to take unscheduled breaks as

needed, and elevate his legs as needed. (Tr. 313). In her last limitation, Dr. Joseph listed not

lifting over ten pounds. (Tr. 314).

On June 29, 2011, Claimant reported doing quite well and having no concerning cardiac

symptoms. (Tr. 333). He has been doing some walking on a treadmill. The ECHO done that day

showed LVEF 60%. Dr. Joseph found his EF improved to about 60% and did not change his

medication regimen. (Tr. 333).

In follow-up treatment on October 5, 2011, Claimant presented for treatment of aortic

dissection. (Tr. 330). Dr. Braverman noted that Claimant's heart failure has basically resolved.

Claimant reported occasional dizziness and lightheadedness. (Tr. 330). Dr. Braverman found him

to be clinically much improved and not having any symptoms of heart failure. (Tr. 331).

Dr. Joseph treated Claimant on December 28, 2011 after he was diagnosed with

congestive heart failure at the time of aortic dissection. (Tr. 317). Dr. Joseph noted EF initially

severely reduced and recently recovered LV systolic function, ejection fracture of 52%. She

found from a heart failure standpoint, his symptoms are unchanged. He complained of exertional

shortness of breath with walking three blocks, fatigue, and occasional leg swelling. The most

recent echocardiogram in October 2011 showed LV fraction of 52%, mild inferior hypokinesis,

mild aortic and tricuspid insufficiency. (Tr. 317). Dr. Joseph found his LV function to be

recovered back to normal on anti-remodeling therapy, but he still continues to have Class II

congestive heart failure symptoms. (Tr. 318). She continued his medication regimen noting how he had improved remarkably on it and referred him for cardiac rehabilitation. "From a heart standpoint we are very pleased with his progress and will continue to see him on an as-needed basis." (Tr. 318).

In follow-up treatment on April 17, 2012, Claimant reported continued episodes of mild lightheadedness and dizziness with episodes of heart racing lasting up to two hours. (Tr. 355). Dr. Braverman noted Claimant has a history of cardiomyopathy and aortic regurgiation in the past, and his LV function had improved over time. (Tr. 356). Dr. Braverman found he does not have any signs of increased volume. Dr. Braverman found Claimant to be stable from a heart-failure standpoint. (Tr. 356). Dr. Braverman encouraged him to do daily weights. (Tr. 357). Claimant reported increased strain in his chest attributed to lifting his father three weeks earlier. (Tr. 357).

The May 2, 2012 CT of his chest showed stable post surgical changes from ascending aortic dissection with aortic root graft repair and aortic right brachiocephalic bypass, and dilated aortic root to be stable. (Tr. 353).

On August 13, 2012, Dr. A. Rashid Qureshi performed a cardiac consultative examination on referral by disability determinations. (Tr. 381). Claimant complained of marked shortness of breath on mild to moderate exertion and only being able to walk half a block and needs to use a cane. (Tr. 382). Dr. Qurshi found Claimant to be extremely depressed and unable to work. He claimed that he cannot lift more than ten pounds, can sit and stand for thirty minutes and unable to handle or finger. (Tr. 382). Dr. Qureshi found could never lift ten pounds, carry ten pounds, sit for thirty minutes total in an eight hour workday, stand for thirty minutes in an eight hour

workday, and walk for ten minutes in an eight hour workday.  (Tr. 374-75).  Dr. Qureshi found

Claimant needed a cane to ambulate.  (Tr. 375).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security

Act through December 31, 2014.  (Tr. 14).  Claimant has not engaged in substantial gainful

activity since February 15, 2009, the amended alleged onset date.  The ALJ found that the

medical evidence establishes that Claimant has the severe impairments of aortic dissection, but no

impairment or combination of impairments listed in, or medically equal to one listed in Appendix

1, Subpart P, Regulations No. 4.  (Tr. 14-15).  The ALJ found that Claimant has the residual

functional capacity to perform the full range of sedentary work.  (Tr. 15).  He is unable to

perform any past relevant work.  (Tr. 18).  Claimant is a younger individual with at least a high

school education and is able to communicate in English.  (Tr. 18).  Considering Claimant's age,

education, work experience, and residual functional capacity, the ALJ found there are jobs that

exist in significant numbers in the national economy that Claimant can perform.  (Tr. 19).  The

ALJ concluded that Claimant has not been under a disability from February 15, 2009, through the

date of the decision.  (Tr. 19).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or

she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the

Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age,

education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-42 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which

is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese , 552 F.3d at 730 (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly evaluate the opinion of his treating

physician.

The undersigned finds that the ALJ considered Dr. Joseph's opinion and gave slight weight to her opinion in his written opinion as follows:

> The claimant's treating physician, Susan Joseph, M.D., submitted a function report on June 28, 2011. Dr. Joseph opined that the claimant was incapable of unskilled sedentary work. Dr. Joseph opined that the claimant would likely miss more than four days of work per month due to symptoms. The undersigned gives this opinion some weight. Dr. Joseph submitted this report six months after the claimant's surgery. The undersigned concurs that this assessment is accurate through the date Dr. Joseph rendered the opinion. However, the undersigned finds that after the date of this opinion, the claimant's condition improved. The record shows that a month before this the date of this opinion, the claimant reported no symptoms of shortness of breath, lightheadedness, or dizziness. By October, his ejection function was 52 percent. By October 2011, his condition had significantly improved. A year after his surgery, the claimant was doing remarkably well on medication and his symptoms were no more than mild. Based on the above, the undersigned gives this opinion some weight.

(Tr. 17) (internal citations omitted).

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley, 580 F.3d at 679. When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

Claimant will not qualify for benefits under the Act unless his impairments were "of such

severity that he [was] not only unable to do his previous work but [could not], considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Thus, if Claimant could perform sedentary work, he is not entitled to disability insurance benefits. The applicable regulations define sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

Although a treating physician's opinion is often given "controlling weight," such deference is not appropriate when the opinion is "inconsistent with other substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)). The record as a whole in this case, including the inconsistencies in Dr. Joseph's treatment notes and her function questionnaire and the effectiveness of his medication, casts doubt on her assertions that Claimant could not perform sedentary work.

First, to the extent Dr. Joseph opined that Claimant is disabled and incapable of performing low stress jobs, a treating physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance,"

because it invades the province of the Commissioner to make the ultimate determination of disability).  The ALJ acknowledged that Dr. Joseph was a treating source, but that her opinion was not entitled to controlling weight because it is inconsistent with the objective medical evidence in the record after the date of the function questionnaire.  See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").  The undersigned notes that Dr. Joseph's opinion is inconsistent with her own treatment notes inasmuch as she never found such functional limitations during treatment.

Dr. Joseph treated Claimant a month before completing the cardiac function questionnaire, but he did not report the conditions and symptoms that he claims render him totally disabled. Indeed, he reported doing much better since his last visit with improved exertional capacity.  Dr. Joseph noted how he did not have any shortness of breath, edema, dizziness, or significant lower extremity edema and found Claimant to be doing well from a heart failure standpoint and prescribed medications as treatment and recommended cardiac rehab to determine what exercise capacity he can tolerate.  As to clinical findings in the function report, Dr. Joseph noted "congestive heart failure with an EF of 15-20% with history of chronic aortic dissection with an aortic root replacement in Dec. 2010."  In the June 29, 2011 treatment note, Claimant reported doing quite well and having no concerning cardiac symptoms and doing some walking on a treadmill.  Dr. Joseph found his EF improved to about 60% and continued his medication regimen.  His medical records likewise reflect no complaints of any disabling problems associated with sitting, standing, or walking; instead one doctor encouraged him to lift weights and another made a referral to cardiac rehabilitation.

The ALJ acknowledged that Dr. Joseph was a treating source, but that her opinions were not entitled to controlling weight, because they were inconsistent with the objective medical records after the date of questionnaire. As noted by the ALJ, Dr. Joseph completed the cardiac function questionnaire six months after his surgery thus the opinions therein would be accurate through the date of the questionnaire. The undersigned notes no examination notes accompanied the June 28, 2011 cardiac function questionnaire. Opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion).

Second, Dr. Joseph's opinions are inconsistent with her clinical treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," id., or when it consists of conclusory statements, Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). See also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements."). Dr. Joseph's opinions are not supported by her treatment notes and are conclusory. See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms, and, thus, insofar as those reported symptoms were

found to be less than credible, [the treating physician's] report was rendered less credible."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). The ALJ properly accorded Dr. Joseph's opinions in the questionnaire little weight inasmuch as her findings were inconsistent with, and unsupported by, the evidence of record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.") (citation and internal quotation omitted). A review of her treatment notes shows she never imposed any functional limitations or any work restrictions on Claimant. See Fischer v. Barnhart, 56 F. App'x 746, 748 (8th Cir. 2003) ("in discounting [the treating physician's] opinion, the ALJ properly noted that ... [the treating physician] had never recommended any work restrictions for [the claimant]"). Dr. Joseph's treatment notes do not reflect the degree of limitation she noted in her June 28, 2011 cardiac function questionnaire. The relevant lack of supporting evidence includes the absence of any restrictions placed on Claimant by Dr. Joseph during her treatment of him. See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011). The undersigned concludes that the ALJ did not err in affording little weight to Dr. Joseph's opinions of June 28, 2011.

Furthermore, treatment has controlled Claimant's impairments: in follow-up treatment of aortic dissection on October 5, 2011, Dr. Braverman found him not having any symptoms of heart failure and his heart failure to be basically resolved and clinically much improved. On December

28, 2011, Dr Joseph continued his medication regimen noting how he had improved remarkably on it and referred him for cardiac rehabilitation. In particular, Dr. Joseph opined "[f]rom a heart standpoint we are very pleased with his progress and will continue to see him on an as-needed basis." On April 12, 2012, Dr. Braverman found Claimant to be stable from a heart-failure standpoint and encouraged him to do daily weights. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) ("An impairment which can be controlled by treatment or medication is not considered disabling.").

Further, no examining physician in any treatment notes stated that Claimant was disabled or unable to work or imposed mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom, 680 F.3d at 1065; Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Thus, the ALJ did not err in giving slight weight to her findings. Renstrom, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts). As

such, the undersigned finds that the ALJ gave proper weight to Dr. Joseph's opinion.

Likewise, the opinions of consultative examiner Dr. Rashid Qureshi were inconsistent with the objective medical evidence of record. Thus, his opinions were not entitled to significant weight for the same reasons that Dr. Joseph's opinions were not afforded controlling weight: his opinions did not account for Claimant's improvement with surgery and medication and inconsistent with the record as a whole. Further, his work-related limitations were primarily based on Claimant's subjective reports as he notes "patient claimed he cannot lift more than 10 pounds at a time and can only sit and stand for 30 minutes and walk for 10 minutes in a total eight hour day....". See Teague, 638 F.3d at 616 (holding that a physician's medical source statement may be discounted when, inter alia, it is based on claimant's subjective complaints).

The undersigned finds that the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __11_ day of December, 2014.